# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **TASHA GIPSON**, | : | Case No. 1:20-cv-294 |
| *Plaintiff,* | : | |
| | : | Judge Jeffery P. Hopkins |
| vs. | : | |
| | : | |
| **CINCINNATI CHILDREN'S** | : | |
| **HOSPITAL MEDICAL CENTER**, | : | |
| | : | |
| *Defendant.* | : | |

## OPINION AND ORDER

This employment action arises from the termination of a nurse who worked in Cincinnati Children's Hospital's cardiac surgery unit. Plaintiff Tasha Gipson ("Plaintiff" or "Ms. Gipson") was terminated from her position at Cincinnati Children's Hospital Medical Center (CCHMC) in February 2019 after a near-miss safety incident that occurred in the operating room during patient surgery. In response to her involuntary separation from the hospital, Ms. Gipson brought this action alleging race and gender discrimination, and retaliation for having reported such discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio Revised Code § 4112. Complaint, Doc. 1, ¶¶ 42–81. She also brings a claim under the Family and Medical Leave Act ("FMLA"), *id.* at ¶¶ 82–90, and a tort claim for intentional infliction of emotional distress, *id.* at ¶¶ 91–94.

Currently before the Court is CCHMC's Motion for Summary Judgment (Doc. 21), in which it requests summary judgment on all of Ms. Gipson's claims.[1] As explained more fully below, Ms. Gipson, who filed with the Court no depositions of witnesses and therefore had nothing but her own account of the events leading up to her discharge to offer, has not raised a genuine issue of material fact as to her entitlement to relief under Title VII, Ohio Revised Code § 4112, or the FMLA, and she has abandoned her tort claim. Accordingly, CCHMC's Motion for Summary Judgment (Doc. 21) is **GRANTED**.

## I.       BACKGROUND

Plaintiff is an African American woman who first started at CCHMC as a nurse in 2003, following nursing school. Doc. 21-1, ¶ 1; Doc. 26-1, ¶ 1. In 2006, Ms. Gipson resigned from her position at CCHMC to move to Atlanta, but then moved back to Cincinnati in 2017 and reapplied to CCHMC for another nursing role. Doc. 21-1, ¶¶ 2–4; Doc. 26-1, ¶¶ 2–4. CCHMC hired her as a Cardiovascular Operating Room (CVOR) nurse. *Id.* at ¶ 5.[2] By CCHMC's account, Plaintiff's performance was underwhelming upon her return, and she had several performance issues which required a higher level of oversight than usual from her supervisor, Brian Schumacher. *See* Doc. 21-2, ¶¶ 2–3. Plaintiff denies having performance issues, Doc. 26-1, ¶ 8, but the record reflects such issues during her probationary employment period. *See* Doc. 21-2, ¶¶ 2–3; Doc. 19-1, PageID 372 (noting that Ms. Gipson and Mr. Schumacher met during her probationary period to discuss areas in which Ms. Gipson needed to improve). Plaintiff's difficulties meant that her orientation period took longer than is typical

---

[1] This case was initially filed before Judge Timothy Black. It was transferred to Judge Matthew McFarland in November 2020, then to the undersigned in December 2022, along with more than two hundred eighty others motions in cases. Hence the reason for delay.

[2] The CVOR unit is responsible for heart transplants and other heart surgeries.

for a new hire, or in Ms. Gipson's case a rehire, but she successfully completed her orientation in December of 2017. Doc. 19-1, PageID 371–72.

Plaintiff's issues with CCHMC began in earnest the following summer. That year, Ms. Gipson asked Mr. Schumacher to change her schedule from four ten-hour shifts weekly to three twelve-hour shifts, and Mr. Schumacher denied the request because he did not have adequate staffing to allow it. Doc. 21-1, ¶ 10; Doc. 21-2, ¶ 4. (Plaintiff contends she was promised twelve-hour shifts at hiring, but her offer letter does not corroborate this. *See* Doc. 19-1, PageID 368–70.) Thereafter, Ms. Gipson made a complaint on CCHMC's human relations hotline, noting her concerns regarding her schedule. Doc. 21-1, ¶ 11; Doc. 26-1, ¶ 11. After she made that complaint, Ms. Gipson met with CCHMC human relations consultant, Jennifer Antaki. Doc. 21-1, ¶ 12; Doc. 26-1, ¶ 12. Ms. Antaki investigated Plaintiff's complaint concerning her scheduling change request and concluded that the schedule she was assigned was appropriate, given that all nurses in Plaintiff's unit work 10-hour shifts. Doc. 21-3, ¶ 2. In a meeting to discuss her complaint about her schedule, Ms. Gipson indicated that she would take FMLA leave if she did not get her requested schedule change—she had recently been approved for FMLA leave to care for her two daughter who were experiencing health problems—and Mr. Schumacher and Ms. Antaki both stated that Ms. Gipson was free to take FMLA leave if she needed. Doc. 21-1, ¶ 55; Doc. 21-2, ¶ 4.

Around that same time, Plaintiff first raised concerns to CCHMC about race discrimination. Following her meeting with Ms. Antaki, Ms. Gipson emailed Charla Weiss, a CCHMC officer responsible for diversity efforts, with concerns—albeit expressed

generally—about race discrimination. Doc. 26, PageID 745–46.[3] Then, on September 12, 2018, Plaintiff used FMLA leave and was late to work. Doc. 21-1, ¶ 15; Doc. 26-1, ¶ 15. When she arrived, Mr. Schumacher reminded Ms. Gipson of protocol for informing her team she would be arriving late, and that she needed to notify Hartford, a CCHMC employee benefits administrator, in the future if she was taking FMLA. *Id.* at ¶ 16. He also emailed Plaintiff's team regarding unit protocol for notifying the team when a person will be late. *Id.* at ¶ 17. Ms. Gipson complained about this incident to Ms. Antaki, and when Ms. Gipson and Ms. Antaki met on September 26, 2018, Ms. Gipson also complained that Mr. Schumacher was discriminating against her because of her race. *Id.* at ¶¶ 18, 22. Ms. Antaki recommended that Plaintiff meet with Ms. Weiss. *Id.* at ¶ 25.

Despite the forewarnings about following CCMHC's leave policy, Ms. Gipson's issues around scheduling and communicating her absences continued throughout the fall. On November 7, 2018, Ms. Gipson abruptly left work for a previously unscheduled doctor's appointment—Plaintiff represents that availability at the doctor's office opened at the last-minute—notably Ms. Gipson did not return to work. Doc. 21-1, ¶ 26–27.[4] Mr. Schumacher and Ms. Antaki met with her the next day to discuss the incident. At the meeting, Mr. Schumacher informed Ms. Gipson that she had failed to show respect for the rest of her unit, because another nurse needed to make childcare arrangements to cover for Plaintiff's absence. Doc. 21-1, ¶ 28–30. After the meeting, Plaintiff failed to follow unit protocol regarding attendance and call-off procedures several more times. *See* Doc. 21-2, PageID 671.

---

[3] The two were unable to coordinate schedules and never met.
[4] Plaintiff contends she received permission to leave and another nurse told her she should not return to work. Doc. 26-1, ¶ 27.

Left with little choice, Mr. Schumacher gave Plaintiff a formal reprimand—a "verbal counseling"—on November 30, 2018. Doc. 21-2, ¶ 10. A memorandum documenting the November 30 meeting identified several performance issues. *Id.* at PageID 670–72. In addition to attendance issues, it noted a possible safety issue in a surgery discovered during a random audit of surgery records. *Id.* at PageID 670. Additionally, the record of that counseling reflects that Ms. Gipson was not at all receptive to criticism of her workplace performance. A handwritten note on the memo from Mr. Schumacher states that Plaintiff refused to sign indicating the memo had been discussed with her, because she "d[id] not agree with the coaching provided." *Id.* at PageID 672.

Leading up to the formal reprimand and shortly before the meeting with Mr. Schumacher, Ms. Gipson had lodged another complaint with CCHMC of race discrimination. This time, she filed a complaint with Mary Widdowson, a CCHMC employee relations manager. Doc. 21-1, ¶ 38; Doc. 26-1, ¶ 38. On that occasion, Plaintiff complained that Mr. Schumacher treated her differently because of her race, noting that she was not allowed to work twelve-hour shifts, that Mr. Schumacher more often observed her in the operating room than other nurses, and mentioning the September 12, 2018, incident in which Mr. Schumacher had to remind Plaintiff of CCHMC's call-off policy and then later included co-workers on an email that drew unwarranted attention to Plaintiff's use of FMLA. Doc. 21-5, ¶ 2. Following up on the complaint, Ms. Widdowson conducted an investigation, which included interviews of six witnesses. Doc. 21-1, ¶ 39; Doc. 26-1, ¶ 39. However, at the end of her investigation, Ms. Widdowson concluded there was "no evidence [Plaintiff's] race impacted how Brian Schumacher treated [her]."  Doc. 21-5, ¶ 4.

The final straw that prompted Plaintiff's termination occurred two months later, on January 8, 2019. Zion Mesfin, a surgical technician working on the surgery and another woman of color who worked in the CVOR, reported that Plaintiff had adjusted the settings on a Bovie machine—a machine that produces an electrical current to cut skin—too high.[5] *See* Doc. 21-1, ¶¶ 40–41; Doc. 26-1, ¶ 41. Amra Gosto, clinical manager in Plaintiff's unit, investigated the incident with Ms. Antaki. Doc. 21-4, ¶¶ 7, 10. Other individuals present during the surgery corroborated that Plaintiff had increased the Bovie setting when she was supposed to decrease it, because she misheard the instruction of the doctor performing the surgery. Doc. 21-4, ¶ 8. When interviewed about the incident, Plaintiff "did not take any responsibility" for the mistake. Doc. 21-4, ¶ 10. Ms. Gosto concluded, however, that Plaintiff failed to follow safety protocols and failed to take accountability for her mistake. As a result, Ms. Gosto made the decision to terminate Plaintiff. Doc. 21-1, ¶ 51. Days later, Ms. Gosto and Ms. Antaki met with Plaintiff to terminate her employment on February 6, 2019. *Id.* at ¶ 52.

Plaintiff filed the instant lawsuit on April 13, 2020. Compl., Doc. 1. Following the close of discovery, during which, as noted, Plaintiff took no lay or expert depositions,[6] CCHMC filed the Motion for Summary Judgment (Doc. 21) presently under consideration. Plaintiff filed a Response (Doc. 26) and CCHMC filed a Reply (Doc. 27) in support of its motion.

---

[5] Ms. Mesfin is a woman of Ethiopian descent. CCHMC characterizes her as African American, Doc. 21-1, ¶ 40, while Plaintiff disputes this characterization. *See* Doc. 19, PageID 320.

[6] At least, none that she has provided to the Court. The only deposition in the record is Plaintiff's deposition. Docs. 19, 20.

## II.    STANDARD OF REVIEW

As the party seeking summary judgment, CCHMC "'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

But the non-moving party, Plaintiff in this case, cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

After reviewing the evidence before it, the Court must determine whether there is some "sufficient disagreement" about material facts that necessitates submitting the matter to a jury. *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "[i]n arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party," here, Ms. Gipson *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III.    LAW AND ANALYSIS

Plaintiff's Complaint includes six counts: (1) racial discrimination in violation of 42 U.S.C. §§ 2000e-2 (Title VII); (2) racial discrimination in violation of Ohio Revised Code §§ 4112.02 and 4112.99; (3) sex discrimination in violation of Title VII; (4) sex discrimination in violation of Ohio Revised Code §§ 4112.02 and 4112.99; (5) violation of her rights under the Family Medical Leave Act; and (6) intentional infliction of emotional distress. Compl., ¶¶ 42–94. CCHMC asks for summary judgment in its favor on all counts. Doc. 21. The standards for proving race or sex discrimination under Ohio law are the same as under Title VII, *see Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003), *and Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.*, 69 Ohio St.3d 89, 95 (1994), so the Court analyzes those claims under Title VII and need not make a separate analysis under Ohio law.

#### A.  Race Discrimination

Title VII makes it unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from discriminating against any employee for opposing an unlawful employment practice, or making a charge that the employer has violated Title VII. *Id.* § 2000e-3(a). Ohio Revised Code 4112.02 similarly makes it illegal for "any employer, because of the race, color, . . . [or] sex . . . of any person . . . to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

Plaintiff alleges that she was subjected to a hostile work environment and then terminated because she is African American. Compl., ¶¶ 45, 55. This claim can be separated into two components: first, that she was subjected to a hostile work environment because she is African American; and second, that she was terminated on that basis. The Court addresses each in turn.

i.  Hostile work environment

In order to prevail on a hostile work environment claim under Title VII, Plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcome . . . harassment; (3) the harassment complained of was based on [race]; (4) the charged [racial] harassment created a hostile work environment; and (5) the employer is liable." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).[7]  As to the first element, CCHMC does not contest that Plaintiff is African American and thus a member of a protected class. Doc. 21. That is as far as Plaintiff gets, however; she does not raise a genuine issue of fact as to whether she experienced race-based harassment.

As to racially motivated harassment, she asserts: that her supervisor Brian Schumacher "harassed her by following her all around the hospital," that a coworker "made negative comments [about] African Americans" and "talked to [her] in a hip hop tone," that a co-worker "falsely accused [her] of not reporting to a case on time," and she was "hassled when trying to get free pizza [] like her white colleagues had done." Doc. 26, PageID 754.

---

[7] The "same principles that govern sexual harassment also govern claims of racial harassment." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021).

Unfortunately, these allegations fall well short of the proof required to allow a jury to conclude that Plaintiff was subjected to a hostile work environment based on race.

In order to prevail on her claim that she was subject to a racially hostile work environment, Plaintiff must prove that that she experienced harassment "so *severe or pervasive* as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (emphasis added). Embedded in this analysis is consideration of whether the harassment complained of was based on Plaintiff's race, or instead "clashing personalities or other reasons not covered by Title VII's protections." *Schlosser,* 113 F.4th at 684.

Applying these rules, Plaintiff has failed to adduce sufficient evidence to allow a jury to conclude that she was subject to severe and pervasive harassment that was racially motivated. Instead, affidavits of the other individuals involved in the incidents Ms. Gipson so heavily relies upon directly contradict her account of these incidents as race-based harassment.[8] For example, Brian Schumacher stated in a sworn affidavit that it was standard practice for him to observe employees in the operating room. Doc. 21-2, ¶ 6. Further, he noted that Plaintiff took longer than is typical to finish orientation, and that he received complaints from other employees about Plaintiff, which prompted additional oversight. Doc. 21-2, ¶¶ 2–3. More problematically for Plaintiff, Mary Widdowson, Employee Relations Manager at CCHMC, attested that she investigated Plaintiff's November 2018 race discrimination complaint. Doc. 21-5, ¶ 4. She interviewed several witnesses and concluded that Plaintiff was

---

[8] Because Ms. Gipson failed to take depositions of any other individuals involved in these incidents, she cannot look to that testimony to corroborate her account or challenge the accounts provided in affidavits offered by CCHMC.

not being treated differently because of race. Instead, Ms. Widdowson concluded that Plaintiff was "treated the same as others." *Id.*, ¶ 5. Having failed to elicit deposition testimony from Mr. Schumacher regarding his oversight of Plaintiff's job performance, Ms. Widdowson on her investigation, or from any of her co-workers regarding racial discrimination, Plaintiff has failed to raise a genuine issue of fact as to whether she was subjected to harassment based on race. Her claim for hostile work environment thus fails.

### ii. Termination

Plaintiff also argued that she was fired because she is African American. Doc. 1, ¶ 45. To defeat summary judgment on a race-based termination claim, "a plaintiff must present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race was a 'motivating factor' for the adverse employment action." *Goodwin v. Newcomb Oil Co., LLC*, No. 23-5594, 2024 WL 1828304 at *3 (6th Cir. Apr. 26, 2024). A plaintiff can make this showing using direct or circumstantial evidence. *Id.* "Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by unlawful discrimination." *Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). Here, Plaintiff offers no direct evidence that her termination was racially motivated. Instead, she asks the court to infer that her involuntary separation from CCHMC was racially motivated, based on surrounding circumstances. *See, e.g.,* Doc. 26, PageID 755 ("Children's Hospital hasn't provided any explanation for why Gipson has to be perfect in all of her surgical cases while Zion and other white employees can commit repeated safety infractions . . . .").

Where there is no direct evidence of discrimination, the Court analyzes Plaintiff's claims using the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Goodwin*, 2024 WL 1828304, *3. That test requires Plaintiff to "first establish a prima facie case of discrimination." *Goodwin*, 2024 WL 1828304, *3. If she successfully establishes her prima facie case, the burden shifts to CCHMC to "offer a legitimate, non-discriminatory reason for the termination." *Id.* If CCHMC does so, the burden "shifts back to [Plaintiff] to show that the proffered reason for termination was not the true reason, but merely a pretext for discrimination." *Id.*

Plaintiff's burden in making a prima facie case of discrimination "is not onerous." *Id.* (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). She can make her prima facie case by showing that she: (1) is a member of a protected class, (2) was qualified for the job she lost, (3) suffered an adverse employment action, and (4) was replaced by or treated differently than a similarly situated employee outside of her protected class. *Id.*

CCHMC argues that Gipson fails to make a prima facie case of race discrimination but does not offer detailed argument on this point. Doc. 21, PageID 647. Upon consideration of all facts, the Court concludes that Ms. Gipson has made such a prima facie case. She is African American and thus is a member of a protected class, CCHMC appears not to contest that she possessed the baseline qualifications for the position,[9] she suffered an adverse

---

[9] Because CCHMC does not offer briefing on this prong, the Court concludes that Ms. Gipson has made the requisite showing that she is qualified, given that the Plaintiff's burden at the prima facie stage is relatively light.

employment action, and was replaced by a nurse who is not a member of the relevant protected class.[10]

The burden now shifts to CCHMC to offer a "legitimate, nondiscriminatory reason," *McDonnell Douglas*, 411 U.S. at 802, for Plaintiff's termination. Here, CCHMC offers such a reason, contending that Ms. Gipson was fired because CCHMC determined—following investigation of the safety incident during the January 8, 2019 heart surgery—that Plaintiff was a safety risk. Doc. 21-4, ¶ 10. As further proof, Amra Gosto, Clinical Manager at CCHMC and the person who made the decision to terminate Plaintiff, attested that she determined Plaintiff was not paying attention during the January 8 surgery, resulting in her setting the Bovie too high, which was a potentially dangerous mistake. *Id.* Amra Gosto also testified that Plaintiff failed to take any responsibility for her mistake or express concern and that another nurse in Plaintiff's department independently raised concerns about Plaintiff's safety practices during the investigation. *Id.* at ¶¶ 9–10.

CCHMC having offered a legitimate, nondiscriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to make a showing that CCHMC's stated reason for her termination was pretextual. *Goodwin*, 2024 WL 1828304 at *6; *McDonnell Douglas*, 411 U.S. at 804. To meet this burden, Plaintiff "must produce sufficient evidence from which a jury could reasonably reject [CCHMC's] explanation of why it fired [her]." *Goodwin*, 2024 WL 1828304 at *6 (internal quotation marks and citation omitted). Like in the

---

[10] CCHMC has not informed the Court of the race of the nurse who eventually replaced Ms. Gipson, Madeline O'Flaherty. *See* Doc. 21, ¶ 59. Affording all reasonable inferences and construing the evidence in the light most favorable to the nonmoving party, here, Ms. Gipson, the Court concludes that her replacement is not African American, as CCHMC noted Ms. O'Flaherty is female—and thus a member of *one* of Plaintiff's protected classes—but made no mention of her race. *Id.*

prima facie case, Plaintiff's burden at this stage is "not heavy" because "summary judgment is warranted only if no reasonable jury could conclude that the employer's offered reason was pretextual." *Id.* (quoting *Strickland v. City of Detroit*, 995 F.3d 495, 512 (6th Cir. 2021). Put another way, summary judgment cannot be granted if plaintiff "has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.* (citation omitted). There are three standard ways to show pretext: "by demonstrating that the proffered reasons (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Id.* (citation and internal quotation marks omitted).

Plaintiff tries all three. She contends that the incident "never happened" because she "never set the Bovie to 115 like they said she did." Doc. 26, PageID 758 (no basis in fact.). Additionally, she says the mistake was "harmless error," and an "honest mistake that would have been easily fixable; that CCHMC has no written policy requiring verbal confirmation of a Bovie setting; and that she "ha[d] to be perfect in all of her surgical cases while Zion [Mesfin] and other white employees can commit repeated safety infractions that actually caused death to patients and remain employed." *Id.* (insufficient to motivate). Finally, she claims she was offered to an opportunity to transfer to another department, and if CCHMC "truly believed she was a safety risk, then it makes no sense that she would offer to send her to a different [department] to be a safety risk there too." *Id.* (not actual motivation).

As an initial matter, Plaintiff's argument on pretext is hampered significantly by the fact that she produced very little evidence of any kind. At the risk of undue repetition, because Plaintiff took no depositions, nor offers any affidavits, the only evidence she relies on is her own deposition testimony, along with several exhibits attached to her Response (Doc. 26) to

Defendant's Motion (Doc. 21). As to the exhibits, the Court declines to consider them because they are not properly authenticated. *See Goodwin v. Am. Marine Express, Inc.*, No. 1:18-cv-01014, 2021 WL 848948, *4 n.3 (N.D. Ohio Mar. 5, 2021) ("When assessing a motion for summary judgment, the general rule is that unauthenticated documents must be disregarded.") (citation and internal quotation marks omitted).[11] This failure makes it extremely difficult, at the outset, for Plaintiff to survive CCHMC's motion for summary judgment. On summary judgment, "the party opposing the motion [] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must *make an affirmative showing with proper evidence in order to defeat the motion*. . . . Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make her case with a showing of acts that can be established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis added) (citation and internal quotation marks omitted).

No basis in fact

As to her contention that the January 8 incident involving the Bovie in the operating room did not happen the way CCHMC recounted, Plaintiff is required to show "'more than a dispute over the facts upon which the discharge was based.' . . . [Plaintiff] must put forth evidence that [CCHMC] did not 'honestly believe' in the given reason for Plaintiff's termination." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007).

---

[11] Plaintiff gives no indication of the source of the proffered documents, and no indication is apparent on the face of the documents, as they do not have Bates numbers. This is further reason to exclude them from consideration. *See Goodwin*, 2021 WL 848949 at *4 n.3 (considering unauthenticated documents cited by plaintiffs if they bore Bates numbers indicating they were produced in discovery but excluding from consideration unauthenticated documents without Bates numbers).

Here, again, Ms. Gipson fails to offer credible evidence that CCHMC did not "honestly believe" she set the Bovie at a higher speed than was requested during the January 8 surgery incident. Instead, the affidavit of Amra Gosto, who made the decision on CCMHC's behalf to terminate Plaintiff indicates that "race and gender and use of FMLA played no part in the decision," and that that decision was "based on the results of the investigation" and her personal assessment that Plaintiff posed a "safety risk," independent of any input from Mr. Schumacher or Jennifer Antaki. *See, e.g.,* Doc. 21-4, ¶¶ 6–11. Amra Gosto's affidavit testimony is uncontroverted and entirely credible. Moreover, Plaintiff has offered no evidence that would allow a reasonable jury to disbelieve that representation.

    Not actual reason

    Plaintiff's arguments that CCHMC's proffered reason was not its actual reason for firing her, or that it was insufficient to justify her firing, fail for similar reasons. As to CCHMC's actual reason for firing her, Plaintiff again offers the Court no basis on which to disbelieve Ms. Gosto's statement that she was fired because of safety concerns arising from the January 8 surgery incident. While Plaintiff contends she was offered the opportunity to move to a different department, and that was inconsistent with her being considered a safety risk, this does not raise a genuine issue of fact as to whether CCHMC fired her because of safety concerns. *First*, Ms. Antaki represents that the conversation to which Plaintiff refers— regarding finding a position in another unit—occurred *before* the January 8 safety incident. Doc. 21-3, ¶ 10.[12] A statement regarding a possible transfer for Plaintiff *before* the January 8

---

[12] It is worth noting, too, that CCHMC was troubled by Plaintiff failing to take responsibility for her mistake, in addition to the mistake itself. Plaintiff's conduct in this regard also contributed significantly to the conclusion reached by Amra Gosto on CCMHC's behalf that Plaintiff posed an unacceptable safety risk. *See* Doc. 21-4, ¶ 10.

incident has little relevance to whether CCHMC considered her a safety risk *after* that incident. *Second,* safety is critical in any hospital, and in any division, but the stakes are particularly high in CCHMC's cardiothoracic surgery unit, so it is plausible that Plaintiff could be a safety risk in the cardiothoracic surgery unit but not elsewhere. *See id.*, ¶ 10 ("Safety is critical on this unit. The children we treat are very ill.").

> Insufficient to motivate

Ms. Gipson also fails to offer sufficient evidence to carry her burden as to her argument that CCHMC's proffered reason for her firing was insufficient to justify that action. Evidence of insufficiency usually "consists of showing that other employees, particularly outside the protected class, were not terminated even though they engaged in acts of comparable seriousness." *Goodwin*, 2024 WL 1828394 at *6 (internal quotation marks and citation omitted). Ms. Gipson attempts to make such a showing, claiming that several other employees made safety mistakes but were not terminated. For example, she claims that two of her co-workers made a mistake while counting surgical supplies, leading to a suture needle being left in a patient's body. Doc. 26, PageID 749. She also makes more extreme allegations, including several allegations of mistakes that led to patients' deaths. *Id.* at PageID 749–50.

These claims are supported only by her own deposition testimony, however, *see id.*, which would not be admissible at trial to prove the events took place. Her testimony regarding these incidents would be inadmissible hearsay, because she is recounting statements she heard about safety incidents for which she was not personally present. Fed. R. Evidence 801; *see* Doc 20, PageID 556 ("[F]or the suture I was not in the room, but I was there on the day. For the shocking, I was not there on the day. For the glutaraldehyde, I was not there on that day."). The Court "may not consider inadmissible hearsay when deciding a summary-

judgment motion." *Flones v. Beaumont Health System*, 567 F. App'x. 399, 405 (6th Cir. 2014). *See also id.* (excluding from consideration thirdhand account of a statement regarding employer's intention to fire plaintiff). Ms. Gipson's secondhand accounts of safety incidents involving other CCHMC staff members would not be admissible at trial, and as such they are not enough to raise a genuine issue of material fact as to whether CCHMC's safety concerns were pretext for Ms. Gipson's firing. *Compare Goodwin*, 2024 WL 1828304 (reversing summary judgment in Title VII action where record evidence of comparators' conduct included, among other evidence, photo evidence of one comparator's conduct, written reprimands from employer for multiple comparators' actions, and deposition testimony of defendant).

Ms. Gipson has failed to raise a genuine issue of material fact as to whether CCHMC's proffered non-discriminatory reason for her firing—safety concerns following the January 8 surgery incident—were pretext. Accordingly, CCHMC is entitled to summary judgment on Plaintiff's race-based termination claim, brought under federal and Ohio law.

### iii. Title VII retaliation

Ms. Gipson also makes a Title VII retaliation claim, claiming that CCHMC terminated her in retaliation for complaining of race and gender discrimination. Doc. 1, ¶ 29. Title VII retaliation claims—alleging that an employee was subject to adverse employment action for complaining of unlawful discrimination—are separately cognizable. *Laster v. City of Kalamazoo*, 746 F.3d 714, 729–30 (6th Cir. 2014). Similar to Title VII discrimination claims, a Title VII retaliation claim can be proved by direct or circumstantial evidence. *Id.* at 730. Where a plaintiff offers only circumstantial evidence of termination in retaliation for Title VII-protected conduct, the *McDonnell Douglas* burden-shifting framework applies.

Here, Plaintiff complained in September and November 2018 that Mr. Schumacher was discriminating against her because of her race. Doc. 21-1, ¶¶ 22, 38. The first complaint was to Jennifer Antaki, an employee relations consultant. Doc. 21-3, ¶ 5. The second was to Mary Widdowson, an employee relations manager. Doc. 21-5, ¶ 2.[13] Ms. Gipson has presented no direct evidence that these complaints were a cause of her termination. In fact, the decisionmaker who chose to terminate Ms. Gipson attested she was unaware that Ms. Gipson had complained of discrimination when she made the decision to terminate her for safety reasons. Doc. 21-4, ¶ 12.

Ms. Gipson having presented no direct evidence of Title VII retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework. Assuming *arguendo* that Ms. Gipson has raised a prima facie argument of retaliation for engaging in Title VII-protected conduct, her retaliation claim nonetheless fails because, for the reasons described in Part A.ii, *supra*, she has failed to raise a genuine issue of fact as pretext.

B. Sex Discrimination

The Court proceeds to apply the same analytical framework applied to Ms. Gipson's race discrimination claims to her sex discrimination claims. Ms. Gipson claims she was subjected to a hostile work environment and then terminated because she is female. Compl., ¶ 65. Much of the evidence she offers to support this claim is the same evidence she offered to support her race-based discrimination claim, and this claim too is significantly weakened by her failing to offer any admissible evidence apart from her own testimony.

---

[13] Ms. Gipson also emailed Charla Weiss, a human resources employee in CCHMC's diversity office, in August 2018 to speak about "multiple concerns," some related to alleged race discrimination, but did not describe her concerns in detail. Doc. 20-1, PageID 589. The two never met. Doc. 26, PageID 746.

### i. Hostile work environment

As for her race-based hostile work environment claim, Plaintiff must prove five elements to prevail on a sex-based hostile work environment claim: "(1) she was a member of a protected class; (2) she was subjected to unwelcome . . . harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (citation omitted).

Unlike her race-based hostile work environment claim, Ms. Gipson does offer some evidence that she was subjected to sexual harassment. She contends that a technician in her unit "repeatedly sexually harassed her and other females in the department," including "whistl[ing] when [she] bent over" and showing her an obscene video on his cell phone. Doc. 26, PageID 742–43.

This argument fails for a separate reason: Ms. Gipson failed to exhaust her administrative remedies with respect to her sex-based hostile work environment claim. As the Sixth Circuit has explained, before filing a lawsuit in federal court, a plaintiff in a Title VII case must "exhaust her administrative remedies by timely filing a charge of discrimination with the EEOC and receiving a right-to-sue letter." *Campbell-Jackson v. State Farm Ins.*, No. 23-1834, 2024 WL 4903807, at *4 (6th Cir. Nov. 27, 2024). Further, the EEOC charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," so that the EEOC charge can serve its purpose, "trigger[ing] an investigation . . . giv[ing] notice to the alleged wrongdoer of its potential liability and enabl[ing] the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Id.* (internal quotation marks and citations omitted). For this reason, as a "general rule, a Title VII plaintiff cannot

bring claims in a lawsuit that were not included in her EEOC charge." *Id.* (citation and internal quotation marks omitted). When assessing whether a particular claim was "included in [an] EEOC charge," *id.*, the "determinative inquiry" is whether the plaintiff "alleged sufficient facts in her EEOC Complaint to put the EEOC on notice" of that claim. *Id.* (citation and internal quotation marks omitted).

Plaintiff's EEOC Complaint, Doc. 1-1, failed to allege sufficient facts to put the EEOC on notice of her claim that she was subjected to a hostile work environment on account of her sex, or otherwise sexually harassed in manner actionable under Title VII. The charge of discrimination she filed with the EEOC focused primarily on her claim of race discrimination, Doc. 1-1, PageID 15 ("I believed Brian [Schumacher] treated me differently because of my race. . . ."), and included only conclusory allegations of gender discrimination. *Id.* ("I also believe Children's Hospital discriminated against me based on my race and gender during my employment."). Those nondescript, generalized allegations were insufficient to put the EEOC on notice that Plaintiff believed she was subjected to sexual harassment in the workplace so "severe and pervasive," *see* Doc. 26, PageID 753, that it created a hostile work environment. Indeed, she made no mention of sexual harassment and no mention of the coworker, Josh Smith, whom she claims harassed her.[14] Doc. 1-1. For that reason, Ms. Gipson failed to

---

[14] One statement in the EEOC charge that could be seen to relate to her claim of sexual harassment is her allegation that Mr. Schumacher "follow[ed] [her] around the hospital (including to the bathroom)." Doc. 1-1, PageID 15. In context, this allegation was one of race-based differential treatment, not sexual harassment. *Id.* (alleging, earlier in same paragraph, that Mr. Schumacher "treated [her] differently than [her] similarly situated white employees and subjected [her] to a hostile work environment.") While the Court construes Ms. Gipson's Complaint liberally, *see Campbell-Jackson*, 2024 WL 4903807 at *4, her EEOC charge nonetheless did not put the EEOC on notice of any claim against CCHMC for a sex-based hostile work environment. Notable in this connection, much of her complaint focuses on other female employees allegedly being treated more favorably than her. Doc. 1-1.

exhaust her EEOC remedies with respect to her sex-based hostile work environment claim and CCHMC is entitled to summary judgment on that claim. *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010) ("[A]llowing a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role.").[15]

ii. Termination

Plaintiff also alleges she was terminated because of her sex in violation of Title VII. Her burden in proving a claim for sex-based discrimination in firing is the same burden as it is for her claim of race discrimination, recited above.[16] To reiterate, she must prove that her sex was a "motivating factor," *see Goodwin*, 2024 WL 1828304 at *3, in her termination. Again, Plaintiff presents no direct evidence of sex discrimination—evidence that leads without any inferences to the conclusion that she was terminated because she is female—so she must make her case using circumstantial evidence. To make that case, Plaintiff must show, as in the race discrimination context, that: (1) she was a member of a protected class; (2) she was terminated; (3) she was qualified for the position she previously held, and (4) she was replaced by someone outside the protected class or treated differently than similarly situated employees outside her protected class. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

_____

[15] Additionally, Ms. Gipson faces the same problem with respect to this claim as with her other claims—having taken no depositions, she fails to present any evidence to support this claim apart from her own statements.

[16] Because her EEOC complaint complained generally of race and gender discrimination, and alleged discriminatory termination, the Court concludes that this claim is within the scope of her EEOC charges. This conclusion is not necessary to the Court's resolution of this claim, however, because it fails for separate reasons as stated.

Ms. Gipson fails to satisfy the fourth requirement because she was replaced by a woman and fails to adduce any evidence that she was treated any differently from similarly situated male colleagues with respect to the circumstances surrounding her termination. Doc. 21-1, ¶ 59. In recounting instances in which other employees were given more leeway than her with respect to safety violations, she identifies no safety incidents involving only male colleagues—some alleged incidents she recounts involve both male and female colleagues—or otherwise identifies how her male colleagues were treated preferably with respect to these violations. Doc. 26, PageID 749–50. While the burden of establishing a prima facie case of disparate treatment is "not onerous," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), it cannot be satisfied by mere conclusory allegations of sex-based termination like those presented here. *See also Orsini v. East Detroit Public Schools*, 61 F.3d 904, 1995 WL 428426 at *3 (6th Cir. 1995) (unpublished) (concluding that female school psychologist being replaced by female defeated sex-based termination claim).

The claim also fails for the separate reason that her termination was not pretextual, as explained above.

### iii.  Retaliation

Ms. Gipson also alleges she was terminated in retaliation for complaining of gender discrimination. Compl., ¶¶ 29, 62–71. This claim falls under the rubric of retaliation for Title VII-protected conduct, which the Court addressed *supra*, Part A.iii. CCHMC is entitled to summary judgment on this claim for the reasons stated therein.

### C.  Family and Medical Leave Act

Ms. Gipson also alleges that CCHMC violated her FMLA rights because it "penalized and/or retaliated against [her] for exercising her FMLA rights and taking FMLA leave" and

otherwise "discriminated against [her] for exercising her rights under the FMLA." Compl., ¶¶ 84–85. To support her FMLA claim, she argues that CCHMC (1) interfered with her exercise of her FMLA rights, in violation of 29 U.S.C. § 2615(a)(1), and (2) separately retaliated against her for her exercise of those rights, in violation of 29 U.S.C. § 2615(a)(2). Doc. 26, PageID 759–60. The Court addresses each in turn.

### i. Interference

The FMLA "confer[s] on eligible employees 'two interrelated, employee substantive rights': 'the right to use a certain amount of leave for protected reasons, and the right to return to an equivalent job after using protected leave.'" *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 865 (6th Cir. 2023) (quoting *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (alterations omitted)).

In terms of enforcement, there are two types of FMLA claims employees may bring: interference claims and retaliation claims. *Milman*, 58 F.4th at 866. The first type of claim arises when an employee is "denied a substantive entitlement—for example . . . denied leave to which she is entitled." *Id.* The second arises "when an employer takes an adverse employment action against the employee for exercising or attempting to exercise a right protected by the FMLA." *Id.*[17]

---

[17] There is some confusion over the statutory source for these claims. As relevant here, the FMLA identifies two categories of prohibited practices. First, the statute makes it unlawful for an employer to: "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Second, the statute makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Sixth Circuit has frequently recognized § 2615(a)(1) as the source of interference claims and § 2615(a)(2) as the statutory basis for retaliation claims. *See, e.g.,*

24

To prevail on her interference claim, Plaintiff must establish that (1) she was an "[e]ligible employee," *see* 29 U.S.C. § 2611(2); (2) CCHMC is an "employer," *see* 29 U.S.C. § 2611(4); (3) she was entitled to leave under the FMLA, (4) she gave CCHMC notice of her intention to take leave, and (5) CCHMC denied her FMLA benefits to which she was entitled. *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (*superseded on other grounds as stated in Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 615 (6th Cir. 2013)).

CCHMC contests only the fifth element, arguing it never denied Plaintiff's FMLA benefits or otherwise interfered with her exercise of those benefits, as Plaintiff received all FMLA leave she requested. Doc. 21, PageID 650. Plaintiff does not contest that she received all FMLA leave she requested, as she testified in her deposition. Doc. 20, PageID 446.

Rather than asserting that she was denied FMLA leave she requested, then, Ms. Gipson merely asserts that her supervisors "gave her a hard time" for taking FMLA leave on various occasions and in that way interfered with her use of FMLA leave. Doc. 26, PageID 743. Incidents she recounts to support this claim include a meeting in which Mr. Schumacher allegedly publicly criticized Plaintiff for taking FMLA leave on short notice, and Mr. Shumacher changing call-off procedures—including for FMLA leave—in November 2018. Doc. 26, PageID 744; Doc. 20-1, PageID 596–97.

---

*Bryant v. Dollar General Corp.*, 538 F.3d 394, 401 (6th Cir. 2008). However, it has also recognized that a retaliation claim may be cognizable under § 2615(a)(1), because retaliation against an employee for taking FMLA leave is a "form of interference or restraint on the ability to exercise that statutory right." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 867 (6th Cir. 2023). While it would improve "textual precision" to settle which subsection is the source of the cause of action for retaliation, *see id.* at 874 (Nalbandian, J., conc.), the distinction is "of no practical consequence" here because the same standard of proof applies to claims brought under either subsection. *Id.* at 867 (maj. op.).

While it is possible for a plaintiff to prevail on an interference claim without having her FMLA request denied—this would be on a theory that her employer's conduct "discourage[d]" or "chill[[ed]" her use of FMLA leave—to do so she must "offer[] evidence that [the employer's conduct] in fact, caused her or any other employee to refrain from requesting or using FMLA leave." *Bonfiglio v. Toledo Hospital*, No. 3:16-cv-2163, 2018 WL 5761220, at *12 (N.D. Ohio Nov. 1, 2018) (quoting *Santoli v. Vill. of Walton Hills*, No. 1:12-cv-1022, 2015 WL 1011384, at *5 (N.D. Ohio Mar. 3, 2015)). If she claims she was discouraged from requesting FMLA leave she must also show that discouragement "would have dissuaded a similarly situated employee of ordinary resolve" from requesting FMLA leave. *Id.* (quoting *Vess v. Scott Med. Corp.*, No. 3:11-cv-2549, 2013 WL 1100068, at *2 (N.D. Ohio Mar. 15, 2013)).

Plaintiff has failed to create a genuine issue of material fact on this point. She does not claim she was ever discouraged from requesting FMLA leave, and the Court cannot come to such an inference from her assertion that her supervisors "gave her a hard time" for taking FMLA leave. Doc. 26, PageID 743. The facts Ms. Gipson alleges bear some comparison to *Bonfiglio*, where plaintiff and his employer had a heated exchange about company policies for use of FMLA leave, following which plaintiff made an internal complaint. *Bonfiglio*, 2018 WL 5761220 at *12. Nonetheless, he continued to take FMLA leave and did not otherwise show that his employer dissuaded him from exercising rights under FMLA. *Id.* Here, as in that case, communications between an employee and an employer about company policies for taking FMLA leave—even heated discussions—are not enough to raise a genuine issue for trial on an FMLA interference claim, particularly where the plaintiff continued take FMLA leave

unrestrained following that discussion.[18] *See id.*; Doc. 26, PageID 760 (Gipson Response asserting that she took FMLA leave in late January 2019).

 ii. Retaliation

To make out an FMLA retaliation claim, Plaintiff must establish the following elements: "(1) she was engaged in protected activity; (2) her employer knew she was engaged in the protected activity; (3) her employer took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 867 (6th Cir. 2023).

CCHMC argues that Plaintiff has failed to raise a genuine issue as to element four, because she failed to "establish a causal connection between her request for FMLA and her termination six months later." Doc. 21, PageID 651. Applying the *McDonnell Douglas* burden-shifting framework, the Court agrees that Plaintiff fails to raise a genuine issue of fact as to whether she was subject to FMLA retaliation.

"Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas*[.]" *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Here, Plaintiff offers no direct evidence connecting her termination to her use of FMLA leave, i.e., evidence from which the Court can draw the conclusion without any inference that her use of FMLA leave was a factor in

---

[18] Ms. Gipson also takes issue with her unit putting in place a new call-off policy after she took FMLA leave. Doc. 25, PageID 744 (asserting that Mr. Schumacher "changed the hospital's FMLA policy and required employees to pick up a shift to make up for absences, even if they were FMLA related"). This argument similarly fails because Ms. Gipson does not establish that the policy in fact discouraged her from taking FMLA leave. Additionally, it is well-established that an employer may "enforce its usual and customary notice and procedural requirements" against employees who take FMLA-protected leave. *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 615 (6th Cir. 2013).

her termination. *Compare Hamilton v. Norfolk Southern Corp.*, 1:21-cv-740, 2024 WL 4827008 (S.D. Ohio Nov. 19, 2024) (finding direct evidence where decisionmaker discussed plaintiff's request for "flexibility in her work to take care of family obligations" when explaining why she was being terminated).

The Court thus proceeds to the tripartite *McDonnell Douglas* framework, the same mode of analysis used to evaluate Plaintiff's claims of race- and gender-motivated termination. Assuming *arguendo* that she has made a prima facie case of FMLA-motivated termination, CCHMC is nonetheless entitled to summary judgment on her FMLA retaliation claim because it terminated her for a legitimate, nondiscriminatory reason, and Plaintiff failed to raise a genuine issue of material fact as to whether that reason was pretextual. *See* Part A.iii, *supra*.[19]

D. **Intentional Infliction of Emotional Distress**

Plaintiff also brought a claim for intentional infliction of emotional distress. Compl., ¶¶ 91–94. She abandoned this claim, however, because she offered no argument in her Response (Doc. 26) to refute CCHMC's contention that it is entitled to summary judgment on the claim (Doc. 21, PageID 651–54). *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368,

---

[19] Ms. Gipson argues that she was retaliated against for taking FMLA leave, not that she was retaliated against for complaining about CCHMC's FMLA leave policies. *See* Doc. 26, PageID 759–61. Retaliation for protest against FMLA policies is also actionable under the FMLA, *see Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 875 (6th Cir. 2023) (Nalbandian, J., conc.). Regardless, the reasoning set out here applies to both kinds of retaliation claims. Whether her claim is based on retaliation for taking leave, or retaliation for complaining about CCHMC policies with respect to taking leave, it fails because CCHMC fired her for a separate, unrelated reason, namely the safety risk she posed to "very ill" children for whom the CVOR unit provided care where "safety is critical." *See* Doc. 21-4, ¶ 10.

372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in a response to a motion for summary judgment.").

## IV.    CONCLUSION

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Ms. Gipson bears the burden of proof on each element of her discrimination and FMLA claims. But to support those claims on summary judgment, she has offered only her own deposition testimony and inadmissible documents attached to her Response. Particularly important, she failed to offer admissible, credible evidence to support her assertion that she was treated unfavorably compared to other hospital personnel involved in safety incidents.

The scant and, in many instances, uncorroborated testimony and other evidentiary support Ms. Gipson proffers to undermine CCHMC's stated nondiscriminatory justification for terminating her are insufficient, as a matter of law, to create a genuine issue for trial as to whether CCHMC violated her rights under Title VII or the FMLA. Accordingly, the Court hereby **GRANTS** CCHMC's Motion for Summary Judgment (Doc. 21).

The Court orders the Clerk to **ENTER JUDGMENT** for Defendant and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

June 2, 2025

Jeffery P. Hopkins
United States District Judge